## Case No. 16,711.

UNITED STATES v. WILLIAMS.

[3 Cranch, C. C. 65.] [1]

Circuit Court, District of Columbia. Dec. Term, 1826.

TRANSPORTATION OF SLAVE—INDICTMENT.

In an indictment under the 19th section of the Maryland act of 1796, c. 67, for aiding and advising the transportation of a slave, there must be an averment of transportation from the District.

Indictment [against Abraham Williams] under the 19th section of the Maryland act of 1796, c. 67, for aiding, assisting, encouraging, and advising the escape of a female slave of W. L. Brent, "by means whereof she was put into a stage to be transported out of the District." The words of the act are: "Any person who shall be found to assist by advice, donation, or loan, or otherwise, the transporting of any slave, or person held to service, from this state, or by any other unlawful means depriving a master or owner of the service of his slave or person held to service; for every such offence the party aggrieved shall recover damages in an action on the case against such offender, and such offender also shall be liable upon indictment to be fined a sum not exceeding $200."

---

## Case No. 16,712.

UNITED STATES v. WILLIAMS.

[4 Cranch, C. C. 372.] [1]

Circuit Court, District of Columbia. Nov. Term, 1833.

CIRCUIT COURT D. C. — SPECIAL CRIMINAL SESSIONS—ATTACHMENTS FOR WITNESSES.

1. The circuit court of the District of Columbia has power to hold special sessions for the trial of criminal causes; and has jurisdiction, at a special session, to try offences committed between the time of ordering and the time of holding such session; and its jurisdiction is not limited to such causes of federal jurisdiction as may be tried in a circuit court of the United States sitting in a state.

2. The circuit court of the District of Columbia, has all the powers which, by law, were vested in the circuit courts of the United States on the 27th of February, 1801, and, among others, the power to send attachments into any other district, for witnesses in criminal cases.

[Cited in Ex parte Pleasants, Case No. 11,225.]
[Cited in U. S. v. Burdick, 1 Dak. 142, 46 N. W. 572.]

Indictment [against Christiana Williams] for keeping a house of ill fame, found at the special session in September last, and continued over, by law, to this term.

Mr. Dandridge, for defendant, moved the

[1] [Reported by Hon. William Cranch, Chief Judge.]

court to quash the indictment, because this court, at this term, has not jurisdiction of the cause, there being no power to continue causes from the special session to this term.

The judiciary act of 1789, § 5 (1 Stat. 73), gives the power to the circuit courts of the United States in these words: "And the circuit courts shall have power to hold special sessions for the trial of criminal causes at any other time, at their discretion, or at the discretion of the supreme court." It does not provide for a continuance of causes from a special to a stated session of the court. That power is given by the act of March 2, 1793 (1 Stat. 333), but it is only given to special sessions appointed in the manner directed by that act, by a justice of the supreme court and a district judge. This court is not a circuit court of the United States. It is the circuit court of the District of Columbia. It can only exercise the powers of a circuit court of the United States in cases within the jurisdiction of a circuit court of the United States. This court had no authority to call a special court, because there were no causes to try when the special session was ordered. The power given to the circuit courts of the United States is to hold special sessions for the trial of criminal causes, not to institute new prosecutions; for the trial only of causes existing at the time of ordering the special session, and for the trial of which the special session is ordered. See Hamilton's Case, 3 Dall. [3 U. S.] 17, and U. S. v. Insurgent [Case No. 15,-442].

THRUSTON, Circuit Judge, said his opinion was that a special court could only be holden for the trial of causes existing at the time of calling the special court; not of causes arising between the order for calling the special court and the actual session of the court.

Mr. Dandridge. It was for the benefit of the prisoners.

THRUSTON, Circuit Judge. And that they might have a speedy trial.

Mr. Dandridge. There is no case where a special court has been called when there were no causes to try. The act of 1793, repeals the provision in the act of 1789, for holding special sessions of the circuit courts. See Mr. Justice Story's opinion in U. S. v. Cornell [Case No. 14,868]. If this court has power to hold special sessions, it is only in federal cases.

THRUSTON, Circuit Judge, said he looked upon the power as only given for existing causes. He approved Judge Brockenbrough's opinion as to his distinction between federal and municipal jurisdiction; and was of opinion that this court has power to hold special sessions for federal offences only; and that only for causes existing at the time of calling the court, and in which indictments had not been found at a stated term.

Mr. J. Dunlop, contra. If Judge Brock-

enbrough's opinion is law, and is to be carried out in all its consequences, we must be in a deplorable condition; the right of appeal must be confined to federal cases.

THRUSTON, Circuit Judge. One consideration bears out Judge Brockenbrough. The leading motive of exclusive jurisdiction was the security of congress from insult; and congress cannot extend jurisdiction beyond the district.

Mr. Dunlop. So also the 30th section of the act of 1789, authorizing the taking of testimony, would be confined to cases of federal jurisdiction.

Mr. Dandridge admitted that in Cohen's Case [6 Wheat. (19 U. S.) 264] the supreme court of the United States decided that congress, in legislating for the District of Columbia, legislated in its national character.

Mr. Dunlop. This court is not a double-faced court. It is altogether federal; created for federal purposes; for the benefit of the national government, and of the people of the whole United States; for the protection of all. Congress had a constitutional right to prescribe the jurisdiction of this court, and to give it all the powers necessary for the exercise of that jurisdiction. They have done so. The same act (27th February, 1801) gives the jurisdiction and the powers. The jurisdiction is given by the 5th section, and the powers by the 3d.

THRUSTON, Circuit Judge. Have the circuit courts of the United States a right to try assault and battery? If they have no such power, then we have no such power.

Mr. Dunlop. If they had jurisdiction to try assault and battery, they would have power to exercise that jurisdiction. This court has the jurisdiction, and therefore has the power to exercise it. But it is said, that the special court had no jurisdiction of causes not existing at the time of calling the session. The power to hold a special session in some cases, is admitted. Then, is there any thing in the laws of the United States to limit it to causes existing at the time of ordering it? It is also said that the act of 1793, continuing the causes to the next stated session, does not apply to a special session holden under the act of 1789.

THRUSTON, Circuit Judge. The special court, mentioned in the act of 1793, must be called by a judge of the supreme court of the United States.

Mr. Dunlop. The act of 1793, regards the place of holding the special session; but the words authorizing the continuance of causes, are general, and apply to all special sessions. If the words are broad enough, its provisions must be applied to all cases within the reason.

THRUSTON, Circuit Judge. The words are, "for the trial of criminal causes;" meaning causes then existing. There must be a cause existing. The probability that causes may arise, will not justify the call of a special court.

Mr. Dunlop. Causes arising after the order for calling, and before the session of the special court, are within the reason and the words of the law.

Mr. Brice, in reply. This court has no right to hold a special session, under any circumstances. The act of 1789, relates only to the circuit courts created by that act. Congress only gave to this court the general powers of the circuit courts of the United States; not the special powers given to particular courts; and those general powers can only be used in cases of general federal jurisdiction. No special session can be called but by a judge of the supreme court of the United States. The act of 1793, either repeals the act of 1789, on this subject, or it appoints and limits the mode in which the power, given by the act of 1789, shall be exercised; so that no special session can be called but according to the mode prescribed by the act of 1793. This is not a circuit court of the United States. The act of 1793, is not applicable to this district, because there is no place nearer to the place where the offence was committed than the regular place of session. The clause of the act of 1793, respecting the return of process, is conclusive that the only causes to be tried at the special session, are causes existing at the time of calling it.

CRANCH, Chief Judge, delivered the opinion of the court, as follows: (THRUSTON, Circuit Judge, contra.)

This is an indictment, for keeping a house of ill-fame, &c., found at the special session of this court, holden in September last, for the trial of criminal causes, under an order of this court made at the stated March term. A motion is now made by the defendant's counsel to quash the indictment, upon the ground: 1st. That no proceeding, or cause which was pending at the special session in September, was, or could be by law continued or removed to this stated term of the court. 2d. That the court had no power to hold a special session for the trial of criminal causes; but if it had, the power was confined to the trial of criminal causes of a purely federal character, such as would be cognizable by a circuit court of the United States, sitting in a state; and such as had arisen and were existing at the time of the order for holding the session. That the special session had no jurisdiction of an offence against what is supposed to be the municipal law of this district; such as the offence is, which is charged in this indictment.

1. The first question is, whether the business depending for trial at the special session in September was, at the close thereof, removed to this stated term of the court. The answer to this question may be given in the words of the 3d section of the act of congress of the 2d of March, 1793 (1 Stat. 333), "That all business depending for trial at any special court, shall, at the close thereof, be considered as of course removed to the next stated term of the circuit court." But in order to show that this cause was so removed, it must appear that the special session had jurisdiction of the cause; that it was depending for trial at that session, and that the session was lawfully holden. This brings us to the second question, namely: 2. Whether the court had authority to hold such a special session for the trial of criminal causes; and whether it had jurisdiction of this cause, the prosecution of which was in no manner commenced until after the special session was opened, nor until the grand jury had, at that session, found a presentment upon their own motion. By the 3d section of the act of the 27th of February 1801 (2 Stat. 103) by which this court was established, it is enacted, "That the said court, and the judges thereof shall have all the powers by law vested in the circuit courts and the judges of the circuit courts of the United States." This section does not confer any jurisdiction upon this court; it gives only the powers necessary for the exercise of its jurisdiction. That jurisdiction is given by the 5th section; and in giving it, no distinction is made between cases of a purely federal character, and those of what might be called a municipal character: nor is such a distinction even suggested. The jurisdiction is given in very simple and comprehensive terms, namely: "That the said court shall have cognizance of all crimes and offences committed within said district; and of all cases in law and equity between parties both or either of which shall be resident, or shall be found, within said district; and also of all actions or suits of a civil nature at common law or in equity, in which the United States shall be plaintiffs or complainants; and of all seizures on land or water, and all penalties and forfeitures made, arising, or accruing under the laws of the United States." Its criminal jurisdiction is of "all crimes and offences committed within the district," whether against an act of congress applicable to the whole United States, or against an act confined in its operation to the District of Columbia. They are equally offences against the sovereign power of the United States, and are equally of federal jurisdiction. When this court was created it was formed upon the model of the other circuit courts of the United States, established by a previous act of the same session, passed on the 13th of February, 1801 (2 Stat. 89), by which the United States were divided into six circuits, and a circuit court, consisting of three judges, provided for each circuit. The circuit court of this district was to have all the powers which by that act were given to the other circuit courts. We are, therefore, referred to the act of the 13th of February, 1801 (2 Stat. 89), for our powers; but not for our jurisdiction. That act expressly conferred upon the circuit courts which it es-

tablished, all the powers theretofore granted to the circuit courts of the United States, in addition to certain other powers expressly given by the same act. It had been enacted by the judiciary act of 1789, § 5 (1 Stat. 73), after fixing certain days for holding a circuit court in each district, "that the circuit courts shall have power to hold special sessions for the trial of criminal causes, at any other time, at their discretion," and this clause is reënacted in the act of the 13th of February, 1801 (2 Stat. 89), nearly in the same words. On the 27th of February, 1801, it is clear, therefore, that the circuit courts of the United States, had, by law, power to hold special sessions for the trial of criminal causes at their discretion; and on that day it was enacted that this court should have all the powers by law vested in the circuit courts of the United States. This court, therefore, had the power to hold special sessions for the trial of criminal causes at its discretion. The special session of September was ordered by this court on the 18th day of May, 1833, being the last day of the stated March term. There were at that time persons either in jail or bound by recognizance, upon whose cases the grand jury, which had been discharged, had not acted. It was presumed by the court, from the experience of former years, that in the long vacation of more than seven months which would intervene before the next stated term in November, many persons would be committed to gaol upon criminal charges, some of whom might be innocent, and all of whom the law would presume to be so until found guilty upon trial. With the view, therefore, of diminishing the term of their imprisonment, and of preventing unnecessary expense to the United States in maintaining them in prison, the court deemed it proper to order the special session, as it believed it had power to do. But it is now objected, that if this court has power to order a special session for the trial of criminal causes, it has only the same power which a circuit court of the United States sitting in a state would have; and as such a court would have authority to order it only for the trial of offences against those laws of the United States which are to operate equally throughout the United States by virtue of the general powers vested in congress by the constitution, this court can only order it for the trial of like offences; and not for the trial of offences against what are supposed to be the municipal laws of the District of Columbia.

In support of this objection the counsel for the defendant cited the opinion of a very respectable state judge in Virginia, who has recently discharged upon habeas corpus a person attached by a process from this court sitting in Alexandria for not attending as a witness in a criminal prosecution, then pending before the court. Whether that opinion be cited as authority, or as containing matter of argument, it justly deserves great consideration from this court. It was cited to support the position, that the powers conferred upon this court by the 3d section of the act of the 27th of February, 1801 (2 Stat. 103), which refers to the powers of the circuit courts of the United States, can only be exercised in the same cases in which they could be exercised by a circuit court of the United States sitting in a state; and that as such a court could not exercise them in a case of state municipal jurisdiction, this court cannot exercise them in a case supposed to be of district municipal jurisdiction. This seems to be the main ground on which that decision was made; and although we cannot consider it as authority, we wish it to have all the effect which the reasoning, upon which it is founded, ought to have. It is admitted in the opinion, (which has been published in the public gazettes,) that, "if the commitment be made by a court having jurisdiction to commit, that court," (that is, the court in Virginia,) "ought not to discharge, although the judgment of the committing court be erroneous." The judge then proceeds to inquire whether this court had power to send an attachment into Virginia for a witness who had failed to obey a subpœna, previously served on him. He admits that the constitution of the United States does vest in congress the power of arming their courts with those powers which are necessary to enable them to discharge their duties; and that in one case it imperatively requires that the courts should exercise those powers; for the sixth amendment declares, "that in all criminal prosecutions the accused shall enjoy the right to have compulsory process for obtaining witnesses in his favor." The judge also admits that, "before the establishment of the constitution, it was well known in every state of the Union what was the nature and character of the compulsory process by which the commands of the courts were enforced." That "the process of attachment was a well-established process for that purpose, and when the constitution vested congress with the power of establishing courts, the 17th clause of the 18th section," (of the 1st article,) "may be fairly understood as vesting them with the power of authorizing those courts to issue attachments, or other process, necessary to carry their orders into effect." The judge further observes: "In our state courts there is no doubt of the existence of the power. We are in the daily habit of imposing fines, or attaching witnesses who refuse to obey the process of subpœna; and I do not see how courts of justice can perform the business before them without the existence of this or some equivalent power." "But," continues the judge, "I have not yet seen any law of congress which authorizes the circuit courts of the United States in any case to issue attachments to run into another district or state than that in which they are hold-

ing their courts. It was deemed necessary to give an express authority by the act of 1793 (1 Stat. 89), to the courts to issue subpœnas into another district or state. The act did not follow up this grant by authorizing attachments to run into another state, in case of disobedience of the process of subpœna. The service of any kind of process from one state in another state was at that time unusual, and if it was necessary that a law should be passed to sanction that practice, it is much more necessary that the more searching and more compulsory process of attachment should be authorized by law. If this case then rested here, I am of opinion that I should be justified in discharging the petitioner, unless some act of congress can be shown authorizing a circuit court of the United States to issue attachments into another state than that in which it is sitting. But the investigation which has taken place here will probably justify, if it does not require, that I should examine the question whether the circuit court of the District of Columbia has a right to issue the process of subpœna beyond the territory of the district, in a case arising under the municipal laws of the district." It is the argument of the judge upon this point which has been urged upon this court in the present cause. As we understand it, it is to the following effect. In each state there are two sets of courts,—federal courts and state courts. The federal courts can only exercise the jurisdiction expressly granted by the constitution of the United States. All other jurisdiction is to be exercised by the state courts. The federal courts had power, by the act of 1793, to send their subpœnas into other districts than that in which they should sit. The state courts had no power to send their subpœnas into the other states. In all cases of municipal jurisdiction, therefore, no subpœna could go out of the state. Congress, in organizing the District of Columbia, might have established two sets of courts in the district, one to exercise the federal jurisdiction, and one to exercise that portion of the municipal jurisdiction which was exercised by the state courts at the time of the transfer of jurisdiction to the United States. If it had done so, one set of the courts would have had power to send its subpœnas out of the district, and the other would not; because, when congress assumed the jurisdiction over this district, and adopted the laws of Virginia and Maryland as the laws of this district, they also took with them the principle, that no state process could run beyond the limits of the state. Congress, however, established only one court in the district. "But still," the judge observes, "they kept up the distinction between federal judicial power, and municipal, or quasi state judicial power; although they conferred both kinds of power on the same court. Thus, in the first section, they enacted that the laws of the state of Virginia should continue to be the law of one part of the district, and the laws of Maryland of the other." Those were the municipal laws of Maryland and Virginia, disrobed of the judicial powers which had been conferred exclusively on the federal tribunals; and connected with the principle just mentioned, "that the process of their courts should not issue beyond their territory; and, consequently, the process of the courts of the district, so far as it was required to carry into effect those laws, could not issue beyond the territory of the district." "Congress," (the judge proceeds,) "in thus prescribing for the district a code of municipal laws, intended to act for them in the same character that the legislatures of the several states act towards the people of their states. They had previously provided for them a set of federal laws in common with the rest of the United States." "Thus the people of the district were immediately provided with two sets of laws, municipal and federal." "It then became necessary to provide a court or courts to carry into effect, within the district, as well the federal as the municipal laws. They created one court for the whole district, and vested it with all the powers by law vested in the circuit courts of the United States." Section 3. "The power conferred by this third section, on the circuit courts of Columbia, is the same with that conferred on other circuit courts, and not greater. What, then, were the powers quoad hoc conferred on the other circuit courts? To issue subpœnas into another district, in cases before them of which they had cognizance; that is, in federal, not municipal cases; of these latter they have no jurisdiction, and, therefore, cannot, in such cases, issue subpœnas into another district. But the circuit court of Columbia has the same powers with those of the other circuit courts, that is to say, they have the power in federal cases to issue subpœnas to another district; but, in municipal cases, in cases arising under the laws of Virginia and Maryland, they have no such power. To allow them the power in such cases, is not to give them merely all the powers belonging to the other circuit courts, but more than all; which cannot be allowed." The judge subsequently observes: "This power (the power of exclusive legislation,) consists of two parts: First, the specific given power of federal legislation; and, secondly, the residuum of legislative power, which, in other cases, is reserved to the states. This residuum is surely as much local as is the legislative power of the states. Congress stands, to the district, in the same relation that the state legislatures do to the respective states. And as a state legislature can only legislate for its own state, and cannot enforce its laws beyond its own limits; so neither can congress, in legislating for the district, cause its district laws to be carried into effect in the states, without their con-

currence. In taking this view of the constitution, I should say that congress has no right to pass any law directing the process of the courts of Columbia to run into any of the states for the purpose of enforcing the merely municipal laws of the district, though these municipal laws should be enacted or adopted by congress itself. I do not, however, think that they have, as to this matter, passed such a law."

One of the principal errors of this argument seems to us to have arisen from confounding the powers of a court with the jurisdiction of a court; from using the terms "powers," and "jurisdiction," as synonymous; and affirming of one what is only true of the other. No two ideas can be more distinct than power and jurisdiction. The powers of a court are the means by which it is to exercise its jurisdiction. Power, in the sense in which it is used in the several judiciary acts of congress, and in the third section of the act of 27th February, 1801, which establishes this court, is not jurisdiction, nor is jurisdiction power; and in the acts of congress the powers, and jurisdiction of the courts, are often given in different sections. In the judiciary act of 1789, which was drawn up by Mr. Ellsworth, then a member of congress, and afterwards chief justice of the United States, the powers of the courts of the United States, are given in sections 3, 5, 7, 14, 15, 17–20, 23, 26, 30–33; but the jurisdiction of the respective courts is given in sections 9–13, 21, 22, and 25.

So in the act of the 13th of February, 1801, (to which this court is referred for an enumeration of its powers,) the powers of the respective courts are given in sections 2, 7, 8–10, 15, 18, 24, 26, 30, 31; but their jurisdiction is given in sections 11–14, 16, 20, 33, and 34. In the fifth section of the act of 29th of April, 1802 (2 Stat. 456), "to amend the judicial system," the powers and jurisdiction of the circuit courts constituted by that act, are given in the same section, and the same sentence; but the words "power," and "jurisdiction," are both used. The language is, "And the circuit courts, constituted by this act, shall have all the power, authority, and jurisdiction, within the several districts of their respective circuits, that before the thirteenth day of February, one thousand eight hundred and one, belonged to the circuit courts of the United States." By thus using both terms, it is evident that congress did not consider either of them alone as sufficient to convey the ideas included in both; and that the word power, as applied to a court, did not necessarily include the idea of jurisdiction; nor the word jurisdiction, that of power. Still less does the word "powers," (in the plural,) which is the term used in the grant of the powers of this court, imply jurisdiction, particularly, if the jurisdiction of the court, as in the present case, be expressly given in a separate and distinct section. In the seventh section of the act of the 29th of April, 1802, it is enacted, that the district courts thereby directed to be holden, "shall, respectively, have and exercise, within their several districts, the same powers, authority, and jurisdiction, which are vested by law in the district courts of the United States." The act of the 24th of February, 1807 (2 Stat. 420), authorizes the appointment of a sixth associate justice of the supreme court of the United States, and constitutes a seventh circuit, consisting of the districts of Kentucky, Tennessee, and Ohio; in which circuit courts are erected, and by the third section it is enacted, "That all the authority, powers, and jurisdiction, vested in the several circuit courts of the United States, or the judges thereof, or either of them, shall be, and hereby are vested in, and may be exercised by the several circuit courts of the seventh circuit, and the judges thereof." And by the first section it is enacted, "That so much of any act or acts of congress as vests in the district courts of the United States in the districts of Kentucky, East and West Tennessee, and Ohio, the powers, authority, and jurisdiction, of the circuit courts of the United States, shall be, and the same is hereby repealed." And by the fourth section it is enacted, that "all the authority, powers, and jurisdiction, vested in the several district courts of the United States, and the judges thereof, in those districts in which circuit courts are now held, shall be retained, and may be exercised, by the several district courts of Kentucky, East and West Tennessee, and Ohio, and the several judges thereof." By the act of the 31st of January, 1797 (1 Stat. 496), which first established a district court of the United States in the district of Tennessee, it is enacted that the judge of that district "shall, in all things, have and exercise the jurisdiction and powers, which by law are given to the judge of the district of Kentucky." By the act of February 19, 1803 (2 Stat. 201), erecting a district court of the United States in the district of Ohio, the same jurisdiction and powers are given in the same words. The same jurisdiction and powers are given in the same words to the district court of the district of Orleans, by the act of the 26th of March, 1804 (2 Stat. 283). And to the district court of the district of Louisiana, by the act of the 8th of April, 1812 (2 Stat. 701). And to the district court of the district of Indiana, by the act of the 3d of March, 1817 (3 Stat. 390). And to the district court of the district of Mississippi, by the act of the 3d of April, 1818 (3 Stat. 413). And to the district court of the district of Illinois, by the act of the 3d of March, 1819 (3 Stat. 502). And to the district court of the district of Alabama, by the act of the 21st of April, 1820 (3 Stat. 564). And to the district court of the district of Missouri, by the act of the 16th of March, 1822 (3

Stat. 653). There are several other acts of congress respecting the courts of the United States, in which the distinction is clearly kept up between the powers and the jurisdiction of the courts.

Two courts, having the same powers, may have very different jurisdictions. A power, given to a court of limited jurisdiction, to issue all writs and process necessary for the exercise of its jurisdiction, is as large as a like power given to a court of more extensive jurisdiction; and if given in the same words, would be the same power. The powers given to a court are given to enable it to exercise its whole jurisdiction, not a part only. It cannot be understood that congress intended to give this court the identical power which it had given to the other circuit courts; for that was a power to be exercised elsewhere; in the other districts of the United States, and not here. And if the word "same," which is relied upon, means identical, as it must, to support the argument, there is as much reason to limit the power to the territorial districts for which it was given, as to limit it to the subjects of jurisdiction for which it was given. The powers given to the circuit courts of the United States were given to enable them to exercise their jurisdiction, in their respective districts. And the powers given to us were given to enable us not to exercise their jurisdiction in their districts, but our own jurisdiction in our own district. In order to give effect to the evident intention of congress, the powers of the circuit courts of the United States must be coextensive with their jurisdiction, and the powers of this court coextensive with our jurisdiction. If the powers which are given to this court are only applicable to that class of cases of which a circuit court of the United States, sitting in a state, would have jurisdiction, we have no powers by which to exercise the residue of our jurisdiction. We have no power to issue a writ in a suit between two citizens of the district; nor, in such a case, to summon a jury; nor to compel the attendance of witnesses; nor to issue execution. The laws of Maryland and Virginia, giving powers to their courts of various descriptions, confer no powers on us. Many cases, indeed, arise under those laws, of which we have cognizance; not, however, by virtue of any power or jurisdiction conferred by those laws upon the courts of Virginia and Maryland. but solely because the grant of powers and jurisdiction to those courts gave rights to parties, out of which cases arise, under the adopted laws, of which this court has cognizance by virtue of the jurisdiction given to this court by the acts of congress. It cannot be supposed, then, that congress intended to give that restricted sense to the words "all the powers," which would limit the exercise of those powers to that class of cases of which a circuit court, sitting in a state, would have jurisdiction, and leave us entirely without power to exercise by far the larger portion of the jurisdiction which it conferred upon us. Such an idea has never been suggested in this court, either from the bar or the bench, for the thirty-three years during which this court has existed.

It has been before observed, that in the argument we have been considering, the terms power and jurisdiction are used as synonymous, and that the error appears to us to have arisen from affirming of one, what is only true of the other.

That the terms were considered as synonymous, and used promiscuously throughout the argument, is evident to any one who reads it. Taking it, therefore, for granted, that they were synonymous, and that what was true of one, might be affirmed of the other, the argument is, in effect, this: The jurisdiction of the circuit courts of the United States is confined to a certain class of cases. The power of the circuit court of the District of Columbia, is the same as that of the circuit courts of the United States. Therefore, the power of the circuit court of the District of Columbia is confined to a certain class of cases. It is evident, that this argument cannot be valid, unless the powers and jurisdiction of a court are identical, and were so understood by the legislature when they passed the act of the 27th February, 1801. That this was not their understanding, is evident, not only from what has been before observed, but because, after giving the powers in the 3d section, they proceed to give the jurisdiction in the 5th; and that jurisdiction is very different from the jurisdiction given to the circuit courts of the United States. If the argument were sound, it would equally prove that the jurisdiction of this court is confined to what have been called federal cases. The argument would then stand thus: The jurisdiction of the circuit courts of the United States is confined to federal cases. The power of the circuit court of the District of Columbia, is the same as that of the circuit courts of the United States. Therefore, the jurisdiction of the circuit court of the District of Columbia is confined to federal cases. But it is admitted in the argument, that the jurisdiction of the circuit court of the District of Columbia is much more extensive than that of the other circuit courts. An argument which leads to admitted false conclusions, cannot be valid. We are satisfied, that it was not the intention of congress to limit our powers by the jurisdiction of the circuit courts of the United States, nor to confine the exercise of those powers to that class of cases which was within the jurisdiction of those courts; but to give us powers coextensive with our jurisdiction. If we have power to issue a subpœna for a witness in any case, we have power to issue it in every case within our jurisdiction. If the other circuit courts have power to send a subpœna in a criminal case, beyond their districts, we have power to send one beyond our district. If they have power to send their process of attachment beyond their districts, so have we to send an attachment beyond ours. If they have power

to hold special sessions for the trial of criminal causes, so have we. The act of congress of the 2d of March, 1793, c. 22, § 6 (1 Stat. 333), declares: "That subpœnas for witnesses who may be required to attend a court of the United States in any district thereof, may run into any other district, provided that in civil causes, the witnesses living out of the district in which the court is holden, do not live at a greater distance than one hundred miles from the place of holding the same." And by the judiciary act of 1789 (1 Stat. 73), it is enacted, "that all the before-mentioned courts of the United States," (including the circuit courts,) "shall have power to issue writs of scire facias, habeas corpus, and all other writs, not specially provided for by statute, which may be necessary for the exercise of their respective jurisdictions, and agreeable to the principles and usages of law;" clearly indicating that the powers granted, were the means by which they were to exercise their respective jurisdictions, and that those powers should extend to every case within their jurisdictions.

The authority of the courts of the United States, in criminal causes, to send subpœnas for witnesses into any district, is unlimited; the exception of civil causes, confirms the general rule in criminal causes. And, by the 17th section of the said act, power is given to all the said courts of the United States, "to grant new trials," &c., and to punish by fine or imprisonment, at the discretion of the said courts, all contempts of authority in any cause or hearing before the same." If a criminal cause be pending before a circuit court of the United States in any district, it cannot exercise its jurisdiction, and try the cause, without witnesses. It cannot obtain witnesses without issuing a writ of subpœna. That writ is necessary to enable it to exercise its jurisdiction, and is agreeable to the principles and usages of law. The court, therefore, has power to issue it. It is a writ commanding the marshal to summon the witness to attend the court. If he refuses to obey the summons, he is thereby guilty of a contempt of the authority of the court. But as the court cannot exercise its jurisdiction without his attendance, another writ becomes necessary; and the only writ agreeable to the principles and usages of law, in such a case, is the writ of attachment founded upon the contempt of the authority of the court, and the power of the court to fine and imprison for that contempt; for, in order to fine and imprison the party guilty of a contempt, he must be brought before the court. The court, therefore, has power to issue the writ of attachment; and it is the only writ applicable to the case, and agreeable to the principles and usages of law. And it is the duty of the court to issue it, whenever it is necessary, to enable the court to exercise its jurisdiction. It is the right of the party, whether that party be the United States, or an individual, to have compulsory process for his witnesses. And so important was that right deemed, that an amendment of the con-

stitution of the United States was obtained to secure it to the accused in criminal prosecutions. And by the act of the 30th of April, 1790 (1 Stat. 112), it is enacted, that "every such person, or persons, accused or indicted of the crimes aforesaid, shall be allowed and admitted in his said defence, to make any proof that he or they can produce, by lawful witness or witnesses, and shall have the like process of the court where he or they shall be tried, to compel his or their witnesses to appear at his or their trial, as is usually granted to compel witnesses to appear on the prosecution against them." Wherever the witness is in contempt for not obeying the subpœna, the writ of attachment must reach him, or the express command of the constitution will be nugatory. The words of the 6th amendment of the constitution, in relation to this subject, are, "In all criminal prosecutions, the accused shall enjoy the right to have compulsory process for obtaining witnesses in his favor." This amendment was intended to secure the enjoyment of the right to the accused, as some doubt might arise, inasmuch as it was not enjoyed in England; but nobody ever doubted the right of the United States to have compulsory process for their witnesses. The subpœna would be nugatory, if it could not be followed by an attachment; and it cannot be supposed that congress intended to authorize the court to issue a command, the obedience to which it could not enforce. It is clear that the accused has a right to a subpœna to run into any district in which his witness may be, and that he has a right, under the constitution, to have compulsory process for obtaining that witness. It cannot be supposed that an act of congress is necessary to give him that right; for that would be to give congress power to withhold a right solemnly granted by the constitution itself. No act of congress was necessary to give validity to the right, and no act of congress could prevent the accused from enjoying it. If, however, an act of congress was necessary, the 28th section of the act of the 30th of April, 1790 (1 Stat. 112), is such an act. But although it seems to be admitted that the accused has the right, yet it is denied that the United States have it. This seems to be so unreasonable a doctrine, that the law ought to be very plain that should justify it. One would hardly believe that the construction of the constitution, and of the act of congress which could lead to such a conclusion, could be correct. The argument in support of it, is this: The act of 1793, which provides that subpœnas for witnesses may run into any other district, &c., is evidence that they could not so run before that act; and as an act of congress was necessary to enable them so to run, an act of congress is equally necessary to enable writs of attachment for disobedience of such subpœnas to run into any other district, &c. But this is not a necessary consequence. In one case, an act might be necessary to remedy an evil, or to supply a defect, or to remove a doubt; but, in the oth-

er, there might be no evil to be remedied, no defect to be supplied, and no doubt to be removed. The evil to be remedied by the 6th section of the act of 2d of March, 1793 (1 Stat. 333), was the uncertainty whether the circuit court could lawfully summon a witness who resided out of the district in which the court sat; and whether, if summoned, the witness was bound to obey the summons. But there was no uncertainty, whether, if the witness were lawfully summoned, and bound to obey the summons, the court could compel him to attend. There was a reason, therefore, for passing an act ascertaining the power of the court to send its summons out of its district, and the consequent obligation of the witness to obey it; but none for giving further powers to the court to compel obedience to its lawful commands. If the act of 1793 is evidence that an act of congress was necessary to enable the court to send its subpœna into other districts, the omission of congress, to pass an act authorizing the court to follow up its subpœna, by an attachment, for not obeying it, is equally evidence that no such act was necessary, and that the court already possessed the power. All that the court wanted was lawful authority, in a criminal cause, to command the attendance of a witness who resided out of the District. It had already all the power necessary to enforce its lawful commands. But, it is said, that, when congress organized this District, there were, in each state, two sets of courts, namely, federal courts, exercising federal powers, and state courts, exercising municipal powers. That the federal courts had the power to send subpœnas beyond the limits of the state, but the state courts had not. That the distinction between the subjects of jurisdiction of these courts was in view of congress, when they were adopting a system of laws for the District. That "it was in their power to have two sets of courts, as in every other part of the United States; that is, one court to be vested with federal powers, another court, with municipal powers. But, that the size of the territory and the number of people did not require such a division of courts, and that considerations of economy, probably, forbade the appointment of so many judges; and that they therefore decided on having only one court. But still, (it is said,) they kept up the distinction between federal judicial power, and municipal, or quasi state judicial power; although they conferred both kinds of power on the same court." The fact relied upon to support the assertion, that congress, in granting jurisdiction to this court, still kept up the distinction between its federal and its municipal jurisdiction, is, that congress adopted the laws of Maryland and Virginia, as they then existed, as the laws of this District. "That it was a fixed principle of those laws, that the process of their courts should not issue beyond their territory;" "that, when those laws were adopted, that principle was adopted with them, and, consequently, that the process

of the courts of that District, so far as it was required to carry into effect those laws, could not issue beyond the territory of the District."

It has been before observed, that this court derives no part of its powers or jurisdiction from the laws of Virginia or Maryland, thus adopted; nor can those laws, in any manner, limit or abridge the powers or jurisdiction of this court. If that be the case, there is no pretence for saying, that congress, in granting powers and jurisdiction to this court, "kept up the distinction between federal judicial power, and municipal, or quasi state judicial power." The terms in which our powers and jurisdiction are given, and which have been already recited, indicate no such distinction; nor is it intimated or suggested in any subsequent act of congress. Nor could it be; for no such distinction exists in this District. That distinction is only applicable to the federal powers, as exercised within the states. Here it is all federal power and federal jurisdiction. In the states there is federal jurisdiction and state jurisdiction, and it is necessary to keep up the distinction, and draw the line between them. But here there is no danger of collision. Here are no conflicting state rights. Here is no government but that of the United States; no executive but that of the United States; no legislature but that of the United States; and no judiciary but that of the United States. All the powers, authority, and jurisdiction exercised here, are as much, and as purely federal, as the powers, authority, and jurisdiction exercised by the United States, within the respective states. This District is wholly federal. It is the creature of the constitution of the United States. It is the seat of the government of the United States. The reasons for providing such a district are to be found in the history of the congress of the confederation, who found, by experience, that they could not rely upon a state government for protection from insult, and who felt themselves degraded by being obliged to sue for protection to the state authorities. The framers of the constitution, therefore, provided for a national district, to be under the sole and exclusive legislation of congress, where every member might feel that he was standing upon his own ground: where the officers of the national government might be protected by the national power; where every citizen of the United States who may have business to transact with the national government, or its officers, may be sure of protection, and where all the citizens of the United States may meet upon a common ground, and feel that they have equal rights. The constitution of the United States gave to congress the exclusive legislation; and the states of Virginia and Maryland ceded the territory. No portion of the state sovereignty or jurisdiction remained in or over the ceded district. The only sovereignty in the District is that of the United States. The only laws that are or can be of force in the

District, are the laws of the United States. The laws of Maryland and Virginia, which were adopted by the act of congress of the 27th of February, 1801 (2 Stat. 103), do not operate here proprio vigore, but solely by virtue of the act which adopted them in mass, instead of enacting them totidem verbis. Such of those laws only can be considered as adopted as were applicable to the circumstances of the District; such as were local in their nature and operation; and such as were applicable only to state officers, or state courts, could not operate here, because the subjects upon which they were to operate did not exist here. That congress did not understand that the court could derive any powers from the laws of Virginia and Maryland, which granted powers to their state courts, is evident, from their having, by the act of the 3d of March, 1801 (2 Stat. 115),—only six days after passing that of 27th of February, 1801 (2 Stat. 103) which adopted those laws,—expressly enacted, "That the circuit courts for the District of Columbia shall be, and they are hereby invested with the same power respecting constables, inspectors, and the inspection of tobacco and flour, surveyors, mills, highways, and ferries, for the county of Alexandria, as have heretofore been invested in the county courts of Virginia, and for the county of Washington, the same power and authority as have been heretofore exercised by the county and levy courts of the state of Maryland, with power to appoint to all other offices necessary for the said District, under the respective laws of Maryland and Virginia." And by the 3d section of the same act of the 3d of March, 1801 (2 Stat. 115), it is enacted, that "the circuit court for the said county of Alexandria shall possess and exercise the same powers and jurisdiction, civil and criminal, as is now possessed and exercised by the district courts of Virginia." These provisions show, clearly that this court could not derive powers or jurisdiction from the laws of Virginia and Maryland, granting powers and jurisdiction to their courts; and, it seems to follow, that our powers and jurisdiction could not be limited or abridged by any law of either of those states, limiting or abridging the power or jurisdiction of their own courts. If, therefore, there had been any law of the state of Virginia expressly forbidding its courts to send its subpœnas for witnesses beyond the limits of the state, it would impose no restriction upon the power of this court to issue its subpœnas beyond the limits of the District. There is, however, no such express law of Virginia. That state has laid no such restraint upon herself. It is a restraint imposed upon her by other sovereign states. But it is said to be "a fixed principle of those laws," (that is, of the municipal laws of Virginia and Maryland,) "that the process of their courts should not issue beyond their territory." It is not, however, a principle of the municipal laws of Virginia, except so far as the law of nations may be considered as a part of those municipal laws. It is a restriction imposed upon sovereigns, by the law of nations, and results from the principle of equality among sovereign states. The rule is, that all sovereigns are equal, and that no one can exercise any authority within the territory of another, without his consent. It is the mutually repellent power of each that supports the rule, and not the municipal law of either. It was not a principle which could be applied to the District of Columbia, unless that District were a sovereign co-equal with Virginia, (which is not the case.) The sovereign of the District of Columbia is the United States; and if the principle is applicable at all, it must apply to the United States and Virginia, not to the District of Columbia and Virginia. But Virginia, by adopting the constitution of the United States, has given permission to the courts of the United States to send their process into Virginia, in all cases of which the judicial power of the United States has cognizance; and it is admitted, in the argument, that a circuit court of the United States, sitting in another district, composed of another state, has power to send its subpœna into the district of Virginia; but it is denied that a circuit court of the United States, sitting in the District of Columbia, has any such power, except in cases supposed to be of purely federal jurisdiction; and we are thus brought back to that point, a part of the argument in support of which has been already considered. It seems clear to us, that it cannot be supported upon the principle, that the process of one state cannot run into another; because the District of Columbia is not a state; and because, as between the state of Virginia and the United States, the principle is yielded by Virginia as to all the jurisdiction given to the United States by the constitution. Nor is it supported by any supposed distinction between our powers in relation to our supposed federal and municipal jurisdiction; for it is all federal. It is admitted in the argument that this court has the power to send its subpœna into another district "in federal cases;" and among the admitted federal cases are "all cases arising under the constitution and laws of the United States;" and "controversies to which the United States shall be a party."

Mr. Chief Justice Marshall, in delivering the opinion of the supreme court of the United States in Cohen's Case, 6 Wheat. [19 U. S.] 379, says, "a case in law or equity consists of the right of the one party as well as of the other, and may truly be said to arise under the constitution or a law of the United States, whenever its correct decision depends on the construction of either." All cases arising in the District of Columbia are cases arising under the constitution and laws of the United States; for there are no other laws in force in the district than the laws of the United States; no other sovereignty to be offended than that of the United States. All crimes and offences committed in that district are

offences against the United States, and every prosecution therefor is a controversy to which the United States is a party. Every case therefore arising in the district, is a federal case, and therefore, according to the admission of the argument, this court has a right to send its subpœna into another district in all cases. In criminal cases to any distance; in civil, to the extent of one hundred miles. And such has been the unquestioned practice of this court ever since its establishment in 1801.

But there is another ground taken in the argument. which also deserves consideration. It is said that "congress stands to the district in the same relation that the state-legislatures do to the respective states; and as a state legislature can only legislate for its own state; and cannot enforce its laws beyond its own limits, so neither can congress. in legislating for the district, cause its district laws to be carried into effect in the states, without their concurrence." This proposition might be admitted; for the power claimed is not to enforce in Virginia the laws enacted for the District of Columbia, but to enforce them within that district; and so far as regards the necessary means of so enforcing them, Virginia has given her consent by adopting the constitution of the United States which, it is admitted in the argument, "does vest in congress the power of arming their courts with those powers which are necessary to enable them to discharge their duties." "And when the constitution vested congress with the power of establishing courts, the seventeenth clause of the eighth section" (of the first article,) "may fairly be understood as vesting them with the power of authorizing those courts to issue attachments, or other process necessary to carry their orders into effect." But it cannot be admitted that congress in legislating for the district is, in relation to the states, restricted by that rule of the law of nations which prevents one sovereign from sending his process into the territory of another. If such be the law a governor of Virginia may visit the seat of government of the United States. He may be waylaid by some enemy from Virginia, and insulted, or beaten, or murdered in the District of Columbia; and in five minutes. the offender and the witnesses may escape into Virginia; where. if such be the true construction of the constitution, the offender can neither be arrested nor tried, and from whence, the witnesses cannot be compelled to come and testify in the only tribunal that has cognizance of the offence. The same thing would happen, in places, purchased by the consent of a state legislature for a fort or magazine, an arsenal or a dock-yard, over which congress has the same power of exclusive legislation that it has over this district. Every fort and dockyard would be a petty sovereignty, and restricted by the law of nations from sending its process into the neighboring states, although its sovereign was the United States.

But it has been decided by the highest tribunal in the United States that "this power" (of exclusive legislation over the district,) "like all others which are specified, is conferred on congress as the legislature of the Union; for, strip them of that character, and they would not possess it. In no other character can it be exercised. In legislating for the District they necessarily preserve the character of the legislature of the Union; for it is in that character alone that the constitution confers on them this power of exclusive legislation." "The clause which gives exclusive legislation, is unquestionably a part of the constitution, and as such binds all the United States." This is the language of Chief Justice Marshall in delivering the unanimous opinion of the supreme court of the United States in Cohen's Case, 6 Wheat. [19 U. S] 424. After answering an argument drawn from the analogy, of the double power of legislation (as it was supposed to be) vested in congress, to the double jurisdiction of a court which exercises jurisdiction at common law and in equity, the chief justice proceeds thus: "Since congress legislates in the same forms, and in the same character, when exercising its exclusive powers of legislation, as well as when exercising those which are limited, we must inquire whether there be any thing in the nature of this exclusive legislation which necessarily confines the operation of the laws, made in virtue of this power, to the place with a view to which they are made. Connected with the power to legislate within this district, is a similar power in forts, arsenals, dock-yards, &c. Congress has a right to punish murder in a fort, or other place within its exclusive jurisdiction; but no general right to punish murder committed in any of the states. In the act for the punishment of crimes against the United States, murder committed within a fort, or any other place, or district of country under the sole and exclusive jurisdiction of the United States, is punished with death. Thus congress legislates in the same act, under its exclusive and its limited powers. The act proceeds to direct that the body of the criminal, after execution, may be delivered to a surgeon for dissection; and punishes any person who shall rescue such body during its conveyance from the place of execution to the surgeon to whom it is to be delivered. Let these actual provisions of the law, or any other provisions which can be made on the subject, be considered with a view to the character in which congress acts when exercising its powers of exclusive legislation. If congress is to be considered merely as a local legislature, invested. as to this object, with powers limited to the fort, or other place, in which the murder may be committed, if its general powers cannot come in aid of these local powers. how can the offence be tried in any other court than that of the place in which it has been committed? How can the offender be conveyed to. or tried in any other place? How can he be executed elsewhere?

How can his body be conveyed through a country under the jurisdiction of another sovereign, and the individual punished, who, within that jurisdiction, shall rescue the body? Were any one state of the Union to pass a law for trying a criminal in a court not created by itself, in a place not within its jurisdiction, and direct the sentence to be executed without its territory, we should all perceive and acknowledge its incompetency to such a course of legislation. If congress be not equally incompetent, it is because that body unites the powers of local legislation with those which are to operate through the Union, and may use the last in aid of the first; or because the power, of exercising exclusive legislation, draws after it, as an incident, the power of making that legislation effectual; and the incidental power may be exercised throughout the Union, because the principal power is given to that body as the legislature of the Union. It is clear that congress cannot punish felonies generally; and of consequence cannot punish misprision of felony. It is equally clear that a state legislature, the state of Maryland, for example, cannot punish those who in another state, conceal a felony committed in Maryland. How then is it that congress, legislating exclusively for a fort, punishes those who, out of that fort, conceal a felony committed within it? The solution, and the only solution, of the difficulty, is, that the power vested in congress, as the legislature of the United States, to legislate exclusively within any place ceded by a state, carries with it, as an incident, the right to make that power effectual. If a felon escape out of the state in which the act has been committed, the government cannot pursue him into another state and apprehend him there, but must demand him from the executive power of that other state. If congress were to be considered merely as the local legislature for the fort or other place in which the offence might be committed, then this principle would apply to them as to other local legislatures; and the felon who should escape out of the fort, or other place in which the felony may have been committed, could not be apprehended by the marshal, but must be demanded from the executive of the state. But we know that the principle does not apply; and the reason is, that congress is not a local legislature; but exercises this particular power, like all its other powers, in its high character as the legislature of the Union. The American people thought it a necessary power, and they conferred it for their own benefit. Being so conferred, it carries with it all those incidental powers which are necessary to its complete and effectual execution." See, also [Kendall v. U. S.] 12 Pet. [37 U. S.] 619, 636, 648. Nothing need be added to the force of this reasoning, and nothing can impair it. Being the unanimous opinion of the highest judicial tribunal of the country, it conclusively settles the law upon that point. If it were not so; if congress has not the nec-

essary power to carry into effect its exclusive legislation over this District, but is limited to the powers of a local municipal legislature, what security has the government here, more than it would have in one of the states? Every member of the executive department whose duties require his residence in the District; every member of congress; every judge of the supreme court; and every citizen of any of the states, who may visit the seat of government, is liable to every sort of personal injury and insult, with little prospect of redress, if the offender or the witness is disposed to step over the line of the District. Such a construction of the constitution would defeat the great object which the people of the United States had in view when they provided for a seat of the national government; and, therefore, cannot be correct.

We have thus examined what we understand to be the argument to support the position, that the powers given to this court by the third section of the act of congress of the 27th of February, 1801 (2 Stat. 103), can only be exercised in that class of cases which is within the jurisdiction of a circuit court of the United States, sitting in one of the states; and are satisfied that the foundations of that argument are not sustainable. We are satisfied that congress, in exercising its exclusive power of legislation over this District, does not act in the character of a mere local legislature, and is not restrained by any rule of state legislation, or municipal legislation, from giving full effect to that power, by all the means which are within its general powers of legislation on the other matters submitted by the constitution to its jurisdiction. We are satisfied that all the powers of this court are equally applicable to all cases within its jurisdiction; that all cases within its jurisdiction, are cases arising under the constitution and laws of the United States. And that all criminal prosecutions for offences committed in this District, are controversies to which the United States is a party; and, therefore, are strictly of federal cognizance. We are, therefore, satisfied that the power of this court to hold special sessions for the trial of criminal causes, is equally applicable to all criminal causes arising in the District, whether they consist of offences against laws of the United States applicable to the whole territory of the United States, or against laws applicable only to the District of Columbia.

There has been, however, another objection urged by the defendant's counsel to the jurisdiction of the court in this case. It is, that the court, at a special session, can try those causes only which existed at the time of the order for holding it. The terms in which the power is given do not indicate such a restriction. The words in the fifth section of the judiciary act of 1789, are, "And the circuit courts shall have power to hold special sessions for the trial of criminal causes, at any other time, at their discretion." But it has been argued from the nature of the power,

that there must be causes to try at the time of the order for holding the court, or it might happen that there would be none to try when the court should be held; and that if the order be founded upon the existence of causes at the time of the order, it should be limited to the trial of those causes only. This construction of the law, is said to be corroborated by the terms used in the third section of the act of the 2d of March, 1793, which authorizes the supreme court, or a justice thereof and the district judge, "to direct special sessions of the circuit courts to be holden for the trial of criminal causes at any convenient place within the District, nearer to the place where the offences may be said to be committed, than the place or places appointed by law for the ordinary sessions, and requires the clerk to give thirty days' notice of the time and place for holding the same; and provides, "that all process, writs, and recognizances, of every kind, whether respecting juries, witnesses, bail, or otherwise, which shall relate to the cases to be tried at the said special sessions, shall be considered as belonging to such sessions in the same manner as if they had been taken in reference thereto." The act of 1789 (1 Stat 73) only authorized the circuit court when in session, to order special sessions. The act of 1793 (Id. 333) authorized the supreme court, or a judge thereof, and the district judge, out of court, to order them. The act of 1789 only authorized them to be holden at a different time. The act of 1793 authorized the holding of them at a different place, and that place was to be nearer to the place where the offences may be said to be committed. The place, therefore, where the offences were said to be committed, must (it is said) be ascertained before the order for a special session can be made under this act; and, of course, the offences must have been committed. Subsequent offences, committed after the order for such a special session, may not have occurred at the same place, but, perhaps, at a place as far removed from the ordinary place of session in an opposite direction; and it is said that it can hardly be supposed that it was the intention of congress to give the special session jurisdiction of such subsequent case; and if not of such a subsequent case, it cannot be presumed that they meant to give it jurisdiction of any subsequent case; for it would be impossible to draw the line; and the court could not say how near to the place of session the subsequent case must have occurred, to bring it within the jurisdiction of the session, unless that line should be prescribed by law. The provision, in the same section, that the process, writs, recognizances, &c., "which relate to the cases to be tried at the said special sessions, shall be considered as belonging to such sessions in the same manner as if they had been issued or taken in reference thereto," it is said, supposes a definite number of cases, and that the process, writs, recognizances, &c., had been issued or taken before the order for the special session; for if issued and taken after that order, and if the special session had cognizance of them, they would be issued and taken in reference thereto. It is said, also, that the provisions of the fifth section of the act of 1789 (1 Stat. 73), and the third section of the act of 1793 (Id. 333), respecting the power of ordering special sessions, being in pari materia, should have a similar construction; and as the power given by the act of 1793, seems to be confined to special sessions for the trial of causes existing at the time of making the order for holding them, the power given by the act of 1789, should be confined in the same manner. The answer to this argument is not difficult.

The special session in the present case, was ordered under the act of 1789, and not under the act of 1793. Those two acts, are not in pari materia, so far as relates to the cases which may be subject to the cognizance of the special sessions which may be holden under each law respectively. A special session under the act of 1789, has cognizance of criminal causes arising in any part of the district; but a special session under the act of 1793 has cognizance only of offences committed in a part of the district nearer to the place of special session than to the place of ordinary session. Although it may be necessary, as well under the act of 1789 as under that of 1793 that there should be criminal causes for trial at the time of making the order for a special session, yet there is nothing in the act of 1789, as there seems to be in the act of 1793, from which an inference can be drawn, that the circuit court, when holding a special session under the act of 1789, cannot exercise its general jurisdiction over all criminal causes arising within the district, and existing at the time of holding the same, whether existing or not at the time of making the order for the special session. The act of 1793 provides only for cases in a certain part of the district, remote from the ordinary place of trial; and although it may be necessary, under that act, that some such cases should exist at the time of making the order for the special session, yet it does not follow, that if like cases should arise in the same part of the district after the order and before or during the special session, the court would not have power and jurisdiction to try them at the same special session. Such cases would fall within the reason of the act; which, undoubtedly, was the promotion of the mutual convenience of all the parties, jurors, and witnesses, and the saving of time and expense; and the provisions of the act, that the writs, process, recognizances, &c., should be considered as belonging to such special sessions in the same manner as if they had been issued and taken in reference thereto, will be fully satisfied by applying it to the writs, &c., issued in the cases existing at the time of the order for the special session; and cannot be applicable to cases arising after such order, because the writs, &c., in such cases would be issued and taken in ref-

erence to the special session. If the case arose nearer to the place appointed for the special session than to the place of ordinary session, it would be a case for the trial of which a special session might be ordered; and as a special session was already called for the trial of like causes, there could be no reason why that special session should not have cognizance of the cause. If the case arose further from the place of special session than from the place of ordinary session, it might be that such special session would not have cognizance of it for that reason; but it would not follow that such special session would not have cognizance of a case arising nearer to the place of such special session than to that of the ordinary session. There is nothing therefore in either of the two acts of congress, which prohibits a special session holden under either of them to take · cognizance of criminal. causes arising after the making of the order for holding such special session. Nor is there any thing in the act of 1789 which prevents a circuit court, when holding a special session under that act, from exercising its jurisdiction over all offences arising within the district, excepting those for which prosecutions had been commenced and were pending in a previous stated session; which causes, so pending in a previous stated session, this court, as well as other courts of the United States, have decided were not cognizable in a subsequent special session. The clause of the act of 1789, which gives to the circuit courts power to hold special sessions, is the last sentence of the 5th section; the whole preceding part whereof is occupied in designating the times and places of holding the circuit courts in the respective districts. After prescribing the days on which they should be holden in each district, the words are, "And the circuit courts shall have power to hold special sessions for the trial of criminal causes at any other time, at their discretion, or at the discretion of the supreme court."

The court, when sitting on any day prescribed by the act, could undoubtedly exercise its whole jurisdiction over all criminal causes arising within the district up to the very day of, and even during its session. The clause which gives the power to hold special sessions only authorizes the court to add a session to those previously designated in the same section, without in any manner abridging its powers or jurisdiction when so holden. It has, indeed, been suggested that the clause of the act of 1789, giving the power to hold special sessions, is repealed by the act of 1793. But there is no ground to support such a suggestion. Both acts may well stand together. There is no repugnancy between them. The act of 1789 regards only the time; that of 1793, the place. By the former a special session could be ordered by the court only; by the latter, it may be ordered by judges out of court. The act of 1793, so far from disclosing any intention of repealing that of 1789, on this subject, expressly declares "that the dis-

trict courts of Maine and Kentucky shall have the like power to hold special sessions for the trial of criminal causes as hath been heretofore given, or is hereby given, to the circuit courts, subject to the like restrictions and regulations."

It has also been objected that thirty days' notice was not given, by the clerk, of the time and place of holding the special session in September. But that is only necessary when the place of holding the session is changed, and the session is ordered by the supreme court, or by a judge thereof and the district judge. That provision does not apply to the special sessions ordered by the circuit court itself under the act of 1789.

Upon the whole, we see no reason to doubt of the jurisdiction of the court in the present case. The motion to quash the indictment is therefore overruled.