## In re LYMAN.[1]

### (District Court, S. D. New York. March 28, 1893.)

1. COURT ROOMS—NEW YORK FEDERAL BUILDING—TREASURY DEPARTMENT—ALLOTMENT OF ROOMS—POWERS LIMITED.

   The United States district court for the southern district of New York derives its right to the occupancy of its rooms in the New York post-office building directly from congress, under the acts passed to provide "permanent accommodations" in New York for the post office and the United States courts. The treasury department never had any power to allot rooms, except an implied power incidental to its duty to adopt plans of construction, so as to accommodate both the courts and the post office under one roof; and that power ceased with the completion of the building and the allotment and occupancy in accordance with such plans. The treasury department has now no power arbitrarily to dispossess either from the occupancy of any of the rooms thus permanently appropriated for its uses. The "control" of the treasury department referred to in the appropriation acts relates solely to care, custody, repair, furnishing, etc., as a custodian for the benefit of the courts and post office, and includes no right of dispossession.

2. THREATENED DISPOSSESSION—PUBLIC OFFICE—INJUNCTION—CONTEMPT.

   An unlawful ousting of this court, its officers and records, from their rooms, would be a contempt; and a threatened attempt so to do may be properly enjoined, on the matter being brought before the court by petition of the clerk.

[1] Reported by E. G. Benedict, Esq., of the New York bar.

## Special Proceeding Restraining Dispossession of the Court.

Statement by BROWN, District Judge:

Order to show cause why the custodian of the United States court and post-office building, his agents, etc., should not be restrained from taking possession of room 114–115, in said building, now occupied by the petitioner as clerk of this court, and from interfering with his possession and use thereof.

The petition, dated April 30, 1892, stated that the said room had been occupied by the clerk, with other rooms, for keeping the records and file papers of the court ever since his accession to office; that of the several rooms formerly occupied by him, he had yielded one room at the marshal's request for the use of the grand jury; and afterwards in 1889, at the request of the post-office department, he had also yielded a room on the fifth floor for the use of the United States postal railway service, under the expectation that additional case room would be supplied in the remaining rooms of the clerk through the action of the treasury department, which, however, has not been supplied; and that there now remains barely sufficient room for the proper safe-keeping and preservation of the files of papers and records of the court; that room 114–115 contains books and files of papers under the United States bankruptcy acts, records of equity suits, and cases arising under the United States internal revenue acts; that these files of papers involve the title to much property in New York; that they are accumulating; and that there is no other accommodation for such books, files, and papers, except in the room where they now are.

That he has been notified in writing by the custodian of the building that said room 114–115 has been "assigned" to Gen. Sharpe, United States appraiser, and that the custodian would forthwith deliver possession of said room to said Sharpe, notwithstanding the clerk's refusal to deliver the same until other room had been offered to be provided for the court records; that no other suitable room in said building had been offered or is available therefor; and that if he is deprived of said room, there will be no room or conveniences essential to the safe-keeping and preservation of a large part of the said bankruptcy records and other papers above stated.

That this building was built upon land deeded to the United States government by the city of New York, upon condition that the building should at all times be used and occupied exclusively as and for a post office and courthouse and for no other purpose; and that if otherwise used, the property should revert to the grantor as absolute owner of the premises.

That the reason why said room is now wanted for said Sharpe is, because said Sharpe, who formerly occupied room 108–109, had been in February last forcibly ejected therefrom, and his papers put out and left in the hall, in order to install in said last-named room the United States supervising inspector of steam vessels, who now occupies that room, without any legal right and in violation of said deed.

On this petition an order was made directing the custodian and said Sharpe to show cause why they should not refrain from interfering with the clerk's possession of the room, with a restraining order meantime. At the hearing Mr. Sharpe appeared in person and filed an affidavit submitting his rights to the disposition of the court, and stating that he had been informed by the custodian that he would be put in possession of room 114–115, and that the key thereto had at his request been delivered to the marshal before the service of the order; but that no use thereof had since the order been attempted to be made.

The custodian submitted an affidavit not controverting any of the material facts stated in the petition, but averring that it has never been the intention of the custodian to deprive the clerk of his possession of the records and files of papers contained in said room 114–115, but that he has always been ready and willing to do everything in his power to facilitate their removal to any of the other rooms now occupied by the clerk, or to such other room as the custodian may under instructions from the treasury department be authorized to assign to him; that the custodian, upon Mr. Sharpe's request for a room (after his expulsion from room 108–109) had been authorized by the treasury department, upon the custodian's suggestion, to assign said room 114–115 to

said Sharpe, and had accordingly done so; that Mr. Sharpe is one of the board of United States general appraisers to whom the circuit court has referred the taking of additional testimony on appeals in customs cases, pursuant to section 15 of the act of June 10, 1890, (26 St. at Large, p. 138, c. 407,) and that said Sharpe acts in such matters as an officer of said circuit court, and desired said room for taking testimony as such referee.

A letter from the secretary of the treasury to the custodian, dated May 7, 1892, was annexed to the affidavit, as setting forth fully the position of the treasury department on the subject; reference was also made to the correspondence with the marshal and the attorney general in July, 1891, in regard to rooms for the United States circuit court of appeals, as evidence that the law department "acquiesces in the claim of the treasury department to the *exclusive control of the* [United States court and post-office] *building.*"

The letter from the secretary of the treasury of May 7th asserts that the instructions to the custodian to assign the said room to Mr. Sharpe were given "by virtue of rights and privileges vested in the secretary of the treasury;" that "the acts of congress for acquiring the site and erecting the building, and the acts making appropriation for repairs and preservation thereof and pay of assistant custodians and janitors" show the will of congress "that said building should be *under the control and within the jurisdiction of the secretary of the treasury exclusively;*" that all court officials make applications for assignments in public buildings for their use, through the department of justice, to the secretary of the treasury, and "that it is the legally vested right of the secretary of the treasury to *exercise whatever discretion* he may deem proper in regard to such cases;" that the assignment of the room in question to Mr. Sharpe was by instruction of the secretary of the treasury, "who exercised his *legally vested discretion* and rights in the case;" that the clerk of the district court, as a subordinate of the attorney general, is not vested with any authority to act in such a case; that no application to the secretary of the treasury for any reversal of the instructions (to assign room 114–115 to Mr. Sharpe) had been made by the attorney general, or by the judge of this court through the attorney general, or by the clerk through said judge and attorney general; and that the attorney general had been requested "to take such action as will require Mr. Lyman to act in his subordinate capacity, that is, under instructions from the department of justice, instead of upon his own responsibility."

In the letter of the secretary to the attorney general of the same date (May 7th) the former complains that the clerk as petitioner had acted on his own authority, resulting in "an attempt to interfere with the legally vested rights and privileges of the secretary of the treasury," and that "such action is at least reprehensible and such as should receive the censure of the attorney general;" it is added that "the [treasury] department will be pleased to give due consideration to any application, statement, or communication from the attorney general, in regard to the assignment of rooms in said building, but submits that the matter of such assignments is one *exclusively within the jurisdiction of the secretary of the treasury.*"

The affidavit submitted by Mr. Lyman in reply to the above states that on March 22d last he wrote to the attorney general stating among other things that the custodian, claiming authority from the secretary of the treasury, was proposing to take possession of one of the record rooms occupied by him as clerk, which was indispensable to him; and suggesting that a protest be entered against it; that he received from the attorney general an answer thereto dated March 24th, of which letter a copy was annexed, stating that the petitioner's letter had been received, and "referred to the attention of the secretary of the treasury, with a *remonstrance*" against taking the room away from him.

R. D. Benedict, for petitioner.

Jas. T. Van Rensselaer, Asst. U. S. Dist. Atty., opposed.

BROWN, District Judge, (after stating the facts as above.) The room in question is one of a suite of rooms along the northwest part of

the corridors of the third and fourth floors of the United States court and post-office building. They are immediately contiguous to the principal district court room used for the trial of causes, and separated from it only by a hall. They are used for the chambers of the judge, and as the clerk's offices for the transaction of the court business, and for the care and preservation of the books and files of the court, and for the necessary consultation of them by the officers of the court and by the public. These rooms not only communicate with each other, but they are connected together by an interior stairway, for greater convenience and economy in use; and they have been occupied by this court for the above-named purposes ever since the completion of the building, some 18 years ago. Room 114--115 is directly over the chambers of the court. It is necessary for the proper custody and safe-keeping of the court books, papers and records, and is already closely filled. In proposing to dispossess the court from the use of it, no other room is offered as a substitute, nor any increased accommodations in its other rooms. It is proposed to dispossess first, and not to consider the question of other accommodations until afterwards, if at all; and no provision is to be made for the convenient care and use of the records in the mean time. The removal is not sought for any temporary purpose, such as the care, preservation or repair of the building; but to oust the court permanently from its possession, for the benefit of a new occupant.

The appraiser, for whose use the room is sought for the purpose of taking testimony in customs appeal cases, though "an officer of the court," does not sit *in court* in the taking of such testimony; he acts only as a referee, whose duty it is "to take the evidence and *return it to* the court." 26 St. at Large, p. 138, § 15. As a mere referee, he would not be entitled to demand room for his use in this building, unless the other two appraisers when similarly appointed, and all other referees appointed by the court in other causes, as well as all receivers, masters, and commissioners, are each to be held similarly entitled to a room; since all such appointees are equally "officers of the court," and in a precisely similar sense. The duties of the appraisers as referees, are, however, so intimately related to the business of the circuit court in customs appeal cases, that that court may doubtless direct their sessions to be held in the rooms of that court; and for that purpose, if its accommodations are at present insufficient, that court may rightfully demand additional accommodations from among any of the other rooms in the building not already otherwise lawfully appropriated. The question here, however, does not relate to the appropriation of unoccupied rooms, or even of rooms temporarily used by persons having no permanent lawful right therein; it relates to the right to dispossess this court of a part of the rooms allotted to it, and occupied and held by it, from the beginning, and, without contradiction, necessary for its uses.

The power of the treasury department over the use and occupation of the entire building, whether already lawfully occupied or not, is claimed to be exclusive and discretionary; and so completely so, that upon this hearing it was denied that any inquiry could be made into the attending circumstances; such as whether the change pro-

posed was necessary or unnecessary; whether Mr. Sharpe was entitled to a room at all; or if entitled, why he was ejected from the room he formerly occupied; or whether the supervising inspector, for whose benefit Mr. Sharpe was ejected, and who was installed in Mr. Sharpe's former room, has any legal right there; or whether there are not other rooms in the building occupied by persons having no lawful right in them, which might be appropriated to Mr. Sharpe, leaving this court unmolested. All these matters, it is claimed, are subject to the determination of the treasury department alone, and not subject to question or review elsewhere.

As the power over the occupation is claimed to be discretionary, so, it is said, there was no need of any prior notice or hearing to be given to the occupant. There was none given in this case. There was no prior inquiry or consultation of the court, or of the clerk, as to their need of the room, or of the practicability of parting with it. The first notice was in effect a notice to quit. Even a right to address the treasury department directly on the subject, is denied. That is allowable, it is said, through the attorney general alone, whose remonstrances, however, have no force except such as the treasury department may choose to give them; that is, in this case, none at all.

The power claimed is exclusive in its nature, and arbitrary and despotic in practice. If valid, the tenure of the United States courts and of the post-office department in the building which the government has built expressly for them and for no other uses, is inferior to that of any other class of tenants known to the law. The most summary of civil proceedings to dispossess the humblest tenant at will, provides for at least some notice, some hearing, and some rule of law that regulates dispossession. Even military discipline has courts-martial. It is only appointees, agents or servants, who have no tenure at all, that are liable to removal at discretion and without notice. Is that the relation of the United States courts and the post office to the treasury department, as respects their occupation of the building expressly built by the government for them alone? Do they hold possession at the mere discretion of the treasury department, and without any permanent tenure?

If the different courts can be ousted from one room or another at discretion without notice and without appeal, it is plain they have no fixity of tenure, nor any tenure at all, save by the mere grace of the treasury department. So far as respects any legal guaranty of protection in their occupation, they might be turned out of room after room, under pretext of the public needs, according to the views entertained by the treasury department, or by the subordinate who might wield its powers, until their functions were crippled or paralyzed. Such a dominating power over the court, lodged in an executive officer merely, would not only be novel and extraordinary, but a standing menace to the independence of the judiciary, and involve a violation of one of the fundamental principles of the distribution of the powers of the three great departments.

The respect of the community and the due influence of the ju diciary department are in no small degree affected by the external conditions of the courts. Among these their stability and permanency are by no means unimportant; and it cannot be doubted, I think, that in the erection of the numerous buildings throughout the country for their use during the last 30 years, congress has had in view, not questions of economy alone or chiefly, but that fixity and permanency of tenure which not only best subserve the convenience of the community and of the courts, but comport with the dignity of the judicial functions. The intent to make their tenure permanent, is seen both in the acts providing for the erection of this building, and in the prior act of August 2, 1854, contemplating "permanent accommodations," (10 St. at Large, p. 333,) to which reference will be again made hereafter.

It seems, therefore, scarcely credible that congress, after having devoted large sums of money in order "to provide permanent accommodations" for the United States courts and the post office, should have proceeded to destroy all permanency of tenure by lodging in any executive officer an indefinite and irresponsible power of dispossessing at discretion either the courts or the post office of their rooms, or to turn out one and put in another at pleasure.

A further objection to the power claimed is that the assertion of an exclusive jurisdiction over questions concerning the right of use and occupation would involve the exercise of judicial functions. The occupation of the building is expressly limited by the deed of conveyance to the uses of the courts and post office. Such uses as are not accessory to these are prohibited. Such persons as fall within these classes have the right to the use of the building, and to the whole of it, as against all others, howsoever they may have come into occupation. The determination of what is, and what is not, within the permitted uses is in the last resort a purely judicial question, which the secretary of the treasury can have no discretionary power to determine as a finality. See Kilbourn v. Thompson, 103 U. S. 168, 192, 193.

There is no statute that gives to the treasury department the authority it now asserts. Its claim thereto is based upon inference from,

(1) The acts providing for the construction and "completion of the building" "upon contracts and plans approved by the secretary of the treasury" and "under his direction;" and

(2) Various clauses in the appropriation acts passed since 1872, in which divers sums of money have been appropriated "for the care, preservation and repair of building and furniture," "pay of assistant custodians and janitors," etc., in the "customhouses, courthouses, post offices, marine hospitals and other public buildings, *under the control of the treasury department*." See Rev. St. § 3684; 26 St. at Large, p. 953; 17 St. at Large, pp. 352, 353; 18 St. at Large, pp. 229, 395, 396; 26 St. at Large, p. 967, etc.

I have diligently examined all the statutes to which I have been referred on these subjects. I fail to find in them any authority given to the treasury department to dispossess the court of any of

the rooms allotted to and occupied by it, upon the completion of the building, in accordance with the plan for its erection; or any power conferred on any subsequent secretary of the treasury to change the plan of allotment of the different parts of the building as then made.

Before considering the statutes referred to, a brief glance at the previous mode of supplying rooms for the courts will be useful, as showing that the secretary of the treasury has never been charged with any duty, or had any general authority, in providing rooms for the courts, save only in adopting plans for the erection of the buildings.

The duty of providing rooms for the courts, including proper offices for the clerks, devolved at first upon the marshal alone, the expense of which was included in the "reasonable contingencies" provided for by the act of May 8, 1792, (1 St. at Large, p. 277, § 4.) U. S. v. Cogswell, 3 Sum. 207. By the act of February 26, 1853, (10 St. at Large, p. 165, § 2,) the allowance to the marshal for rent of court rooms was limited to $50 per year, except upon prior submission of estimates to the secretary of the interior, and instructions from him. This check upon the marshal's expenditure was afterwards transferred, not to the secretary of the treasury, but to the attorney general, with whom it still remains, (Rev. St. § 830;) and now the *renting* of rooms for the use of the United States courts, where they are not accommodated in the government buildings, is vested in the marshal under the supervision of the department of justice, through which the appropriations therefor are made. See 25 St. at Large, p. 978; 26 St. at Large, pp. 410, 882, 883, 987; 27 St. at Large, p. 609;

By the act of February 2, 1854, (10 St. at Large, p. 266,) the secretary of the interior was authorized " to provide by *lease* from year to year, or for a term of years, or at his discretion, rooms in the city of New York for the United States courts and the United States attorney, marshal, and clerks of the circuit and district courts." By the act of August 2, 1854, § 1, (10 St. at Large, p. 333,) the *president* was empowered "to provide necessary accommodations for the courts of the United States and the officers connected with them in the district of Massachusetts, and in the cities of New York and Philadelphia, by fitting up and leasing the same *until permanent accommodations can be provided;*" and by section 2 of the same act the president was "authorized to procure by purchase or otherwise suitable sites for buildings to be used as courthouses and post offices in the cities of Boston, New York and Philadelphia." Under the above acts apartments were from time to time rented at New York in College place and in Chambers street for the use of the federal courts in the immediate vicinity of the present building, until the latter was built and ready for occupancy.

Meantime a commission had been constituted for the purpose of procuring a suitable site in New York, whose report was approved by the joint resolution of January 22, 1867, (14 St. at Large, p. 563;) and the same commission was thereby appointed to purchase the site "for a building to accommodate the post office and United States

courts" in the city of New York, in accordance with their report; and plans and estimates for a suitable building were directed to be submitted to the postmaster general and secretary of the interior. Under this act the site was obtained for $500,000 by deed from the city of New York to the United States, dated and recorded April 11, 1867. The deed conveyed the premises for the exclusive use of a post office and courthouse, and under an express covenant that if used for any other purposes, the premises should revert to the grantor. In 1869 $200,000 were appropriated for laying the foundation and commencing the building. 15 St. at Large, p. 305.

By the act of April 20, 1870, (16 St. at Large, p. 85,) one million of dollars was appropriated "for continuing the building for a courthouse and post office in New York city, provided that no part of this sum beyond five hundred thousand dollars, or any other sum appropriated for this purpose, shall be expended until a contract or contracts for the *completion* of the entire building *in conformity with plans to be approved by the secretary of the treasury and postmaster general,* and at all times under their direction, shall be entered into." By the act of July 15, 1870, (16 St. at Large, p. 295,) $500,000 were appropriated for the same purpose and upon the same conditions, except that the secretary of the treasury alone was thereby authorized "to enter into contracts for the completion of the building," and "to adopt plans previously approved by him." Subsequent payments were authorized for the same purposes in the appropriation bills from year to year under the headings of "Treasury Department," "Public Buildings," until the act of March 3, 1875, where under the same head, (18 St. at Large, p. 395,) appears the appropriation of $388,-160.08 "for completion of building for United States post office and courthouse, New York, including the cost of heating and ventilating apparatus, and the cost of area along the park front, as per report of the supervising architect of the treasury." In May, 1875, this court entered into possession of the room in question, with its other rooms, in accordance with the plan of the building and the allotment thereby made by the secretary of the treasury.

1. Such are the acts of congress for the construction of this building, and the only powers given by those acts to the treasury department. Many other buildings for similar purposes elsewhere have been since erected under similar acts, always upon plans required to be first prepared and approved. These acts do not purport to give to the treasury department any authority or control over the *use and occupation* of the building after it has been completed, or any right to change the occupants at pleasure; still less, any authority to change the uses to which the building was devoted, by assigning rooms to persons not within the terms of the act, or of the deed of conveyance;[1] or to oust either the court or the post

---

[1] This subject was in 1878 under investigation by the United States senate and its judiciary committee, whose report, through Mr. Conkling, was on April 29th of that year printed as follows:

"Report. The committee on the judiciary having been instructed by the following resolution of the senate:

" 'Resolved, that the committee on the judiciary be instructed to inquire for

office from any room of which it was lawfully in occupation, in accordance with the plans adopted and the possession taken upon the completion of the building. These acts show, on the contrary, that the treasury department was but the mere servant and agent of congress to adopt plans for the permanent accommodation of the courts and post office, and to see that the building was built in conformity therewith.

what purposes the post-office building in the city of New York may lawfully be used, and whether any occupation of said building exists, or is proposed, not authorized; and meanwhile, the secretary of the treasury is requested to take no action in regard to the occupation of said building until said committee shall report,'

"—report:

"The title of the United States to the property referred to was acquired by deed, dated the 11th of April, A. D. 1867, from the mayor, aldermen, and commonalty of the city of New York.

"Following the grant is the following condition:

"'Upon the express condition, however, that the premises above described, and every part and parcel thereof, and any building that may be erected thereon, shall, at all times hereafter, be used and occupied exclusively as and for a post office and courthouse for the United States of America and for no other purpose whatever.

"'And upon the further consideration that if the said premises shall at any time or times cease to be used for the purposes above limited, or for some one of them, or if the same shall be used for any other purposes than those above specified, the said premises hereby conveyed, and all right, title, and interest therein, shall revert to and be reinvested in the said parties of the first part, their successors or assigns. And the said parties of the first part shall thereupon become the absolute owners of the said premises and every part thereof, with the appurtenances, and they may then re-enter the said premises and forever thereafter use, occupy, or alien the said premises and every part thereof, in the same manner and to the same extent as if these presents had not been executed.'

"This grant having been accepted by the United States with its conditions, the resulting rights were, in the opinion of the committee, as follows:

"The grantee had the right to erect, as it did erect, a building of dimensions and character adequate and adapted to the fullest accommodation of its postal and judicial services; it has the right of perpetual occupation of the premises for these purposes.

"To devote the premises or any part of them to uses having no relation to the objects denoted in the deed, would in the opinion of the committee, be violative of the terms and spirit of the transaction.

"The restriction is not merely technical or formal. The site is in the densest portion of a great city, and persons of both sexes, resorting to the post office and the courts, have an interest, as others have, in restricting the use of the building, in preventing its being thrown open to all the numbers and classes having occasion to visit revenue offices and the various other offices known in the different branches of the public service.

"Having regard to all the consideration bearing on the question, it is believed by the committee that it would not be expedient or warrantable to assert, on behalf of the United States, any claims to occupy the building or land in question save for the two branches of the public service specified in the deed.

"In expressing this opinion the committee does not mean to affirm that a mere casual temporary use of some portion of said premises, not interfering with the uses prescribed in said deed, would work a forfeiture of the estate."

Efforts were made from time to time to induce the city and state authorities to release the condition of the above deed, but failed.

In adopting plans to accommodate both the courts and the post office under one roof, there was doubtless a duty imposed on the treasury department to ascertain the respective needs of both, and to provide properly for each. As the needs of each were to some extent different, the adoption of proper plans, so as to accommodate all, involved an appropriation of different parts of the building to the uses of each, and the secretary of the treasury had, therefore, for the time being an incidental power of allotment to that extent. But as the power of allotment was a mere incident to the adoption of plans for the building to accommodate all, that power necessarily ended when the building was finished and the allotment made in conformity with the plans adopted, and the parties had entered into possession accordingly. The construction acts gave a special, not a perpetual power. They conferred no authority on subsequent secretaries to undo what the former secretaries had completed. They gave no more power to reallot rooms previously designed and set apart for each and occupied accordingly, than to change any other parts of the former plans, or to tear the building down and build anew.

The plans of the building have not, indeed, been produced by the treasury department. It is said that they have been lost. But as this court entered upon possession of its rooms, including the room in question, upon the completion of the building, and has occupied them ever since, there is not the least doubt that they were a part of the building specifically appropriated to this court in the plan of construction, and provided for this court in that plan, and occupied in accordance therewith. And such is the recollection of those conversant with the facts. No question is made on this point; and I have not the least doubt that the plans, if produced, would show this appropriation. It is the same with the rooms appropriated to the use of the circuit court and of the post-office department, respectively.

The entry into the rooms thus built for them, and their tenure of those rooms, were not by any mere permission or authority issuing from the secretary of the treasury. Their tenure is directly under the act of congress, which devoted the building to their use. The tenure of each is that "permanent accommodation" contemplated by the act of August 2, 1854, and is as fixed, permanent and secure, in the rooms appropriated to them respectively, as if those rooms had been built as a separate building for each. The question is to be treated in precisely the same manner as if the rooms appropriated by the plans to each, constituted separate buildings, under separate roofs. Neither can be ousted therefrom except by some authority proceeding from congress alone.

2. Appropriation acts. It is urged that various clauses found in the appropriation acts, import a grant of this power by implication. As a fair example of the language used in a score or two of these acts during the last 20 years, the following may be cited from the act of March 3, 1891, (26 St. at Large, p. 953:)

"For repairs and preservation of public buildings, repairs and preservation of customhouses, courthouses, post offices, marine hospitals and other public

buildings, *under control of the treasury department*, two hundred and fifty thousand dollars."

The same phrase "public buildings under control of the treasury department" is used in the same way, in the same act, in appropriating moneys for "pay of assistant custodians and janitors;" for "furniture and repairs of furniture;" for "fuel, lights and water for public buildings;" for "heating apparatus for public buildings;" for "vaults, safes and locks for public buildings."

From this phraseology in numerous acts, it is urged that the secretary of the treasury has control over the *use and occupation* of such buildings, and may reassign, and change the occupants, at pleasure. This inference is unwarranted; it is a violation of the canon of legal construction that requires statutes to be interpreted according to the subject-matter. The subject-matter of those acts is not the *use and occupation*, or the occupants of the buildings; but solely the care, maintenance and repair of the buildings. The "control" referred to, therefore, so far as any inference is to be drawn from such acts, is a control as respects care and maintenance alone, that is, as custodian and caretaker, having no reference to any power over the permanent use and occupation. In all these acts, moreover, not one of the passages cited purports to grant to the treasury department any power at all. The language is used by way of description only. So far as it has any force, it is simply by implication of some control already existing. Any such implication cannot possibly extend beyond the subject-matter under consideration in the act, viz. care, equipment, maintenance and repair.

Considered with reference to other parts of the appropriation acts, it is seen that the phrase "public buildings under control of," etc., is merely employed to indicate the class of buildings for which the particular sum of money named is designed to be expended. Some such general description was necessary in order to distinguish the buildings intended from other buildings in charge of the war department, the department of the interior, or the department of justice, etc., for which other appropriations were made for similar purposes. In the act first above cited (26 St. at Large, p. 953) and in many other acts also, there were like appropriations, including janitors and watchmen, for "court rooms under the department of justice," (26 St. at Large, pp. 410, 987; 27 St. at Large, p. 609; 25 St. at Large, pp. 545, 978; 24 St. at Large, pp. 254, 542; 23 St. at Large, pp. 224, 511;) the rented court rooms being, as above stated, under the general supervision of that department.

Examination of the various statutes using this phrase, shows also that it is used merely in the sense of "in charge of" or "under," with which latter word it has been used interchangeably. Thus in the act of June 10, 1872, where I have first found the phrase in question, the two expressions are used as synonymous on successive pages. 17 St. at Large, pp. 351, 352. The last of those two provisions (page 352) was transferred to the Revised Statutes, (section 3684,) but with "under the control of," instead of the word "under" simply. Both expressions manifestly mean the same thing. So

the act of March 3, 1873, (17 St. at Large, p. 514,) on one page uses the phrase "under control of" for similar appropriations for care, repair, etc., and on another (page 523) it speaks of "public buildings *under* the treasury department." In the act of June 23, 1874, (18 St. at Large, p. 229,) while the phrase "under control of" is repeatedly used as respects repairs, etc., those items altogether are placed under the general head of "Public Building *under* the Supervising *Architect* of the Treasury Department." In all these places the words "under" or "under control of" mean "in charge of," and nothing more. No power or authority to control the *use and occupation* of the buildings was conferred or intended to be conferred on the treasury department, or on the supervising architect. The "control" referred to in all the acts is simply a control as respects repairs, care, maintenance, etc., which were the subject-matter of the clauses referred to.

Had congress had an intention to give the treasury department authority to dispossess the courts or post office of any of the offices built and appropriated for their permanent accommodation, or to change their occupancy from time to time, it is not credible that that intent would have been expressed in any such indirect mode, and by recital merely, as in the phrases quoted, instead of by some direct grant of power.

Further evidence that congress had no such intent, is supplied by the act of March 3, 1891, establishing the United States circuit courts of appeals. Section 9 of that act requires the marshal "under the direction of the attorney general and with his approval to provide such rooms in the *public buildings of the United States* as may be necessary" for the courts of appeals; or if that cannot be done, then that "with the attorney general's approval, he lease such rooms as may be necessary." Here is no reference to the treasury department as having any authority whatsoever over the use and occupation of the same public buildings over which that department now claims exclusive control. Had congress ever conferred such an authority, or intended to confer it in the frequent and familiar use of the word "control" in the appropriations for repairs, it is not credible that the direction to supply rooms for the courts of appeals in those same buildings would have been addressed to the marshal and the attorney general, while the treasury department was wholly ignored. That department is not noticed, because after the allotment as fixed in the final plan of construction, it never had any authority to control or to change the use and occupation of the parts of the building allotted to each, and never had any duties or responsibilities (aside from construction) in supplying the courts with rooms, or any power to interfere therewith. Section 9 of the act of 1891 is in precise harmony with the laws and usages of the government from the beginning; nor could the treasury department lawfully have set up any authority against the action of the marshal and the attorney general under the above-cited act of 1891, as respects any rooms available for the courts of appeals.

It is urged that the control over the courthouse and post-office

building must be vested somewhere, since there are three courts to be provided for, besides the post office; and that amid the growing demands for room, in no other way could confusion and collision be avoided.

But the power claimed would, on the contrary, most directly tend to produce collision, instead of avoiding it, by unsettling all permanent right of occupation; and, by making every room liable to change without notice or hearing, it would open the door to perpetual intrigue, change and dissatisfaction.

Nor, so far as I can learn, has there been any previous practice which would lend color for the exercise of the power now claimed by the treasury department, to oust either the court or the post office from any rooms allotted to them in the construction of the building. The papers submitted by the respondents do not allege any such grounds. If, with the lapse of time, the growth of the courts or of the post office is such as to need additional accommodations, it is for congress to provide for the necessary room, as congress did provide in the act of 1891 for the new courts of appeals, as above cited. The remedy from congress is always obtainable. There is no occasion for the assertion of novel and arbitrary powers; nor is the plan of the structure for the "permanent accommodation" of each to be upset, or the rooms of the whole building be made subjects of perpetual strife, simply because the post office may, after some 20 years of occupancy, have become cramped for room; though that is not the origin of the present difficulty. Upon the argument contended for, the treasury department might not only permit unauthorized persons to use such rooms as they please, after dispossessing the courts thereof, but upon the plea of the needs of other occupants, it might oust the courts from the possession of all the large rooms expressly designated for the hearing of causes, crowd them into smaller and insufficient rooms, and convert the larger rooms to such other uses as the treasury department might choose. Any such claim of power seems to me an unwarrantable assumption, manifestly contrary to the letter and spirit of the act of congress for the erection of this building. Between such a power and that claimed in the present case there is no dividing line.

The respondents' contention assumes that the treasury department, instead of congress, is to remedy any supposed inadequacy of room for the courts or for the post office that may arise with the lapse of time. But no responsibility in that regard has ever been imposed on the treasury department. Its only duty and power in relation to this building, as implied from the appropriation acts, is to attend to its proper care, custody and maintenance; and as respects any unoccupied rooms, or rooms occupied by persons having no legal right therein, to conform to the will of congress by turning over such rooms, as the custodian thereof, to either one of the courts, or to the post office, whenever either of them may need such rooms and make known its requirements. This the department is bound to do, not as having any arbitrary authority of its own, but as a simple custodian or caretaker, yielding the keys to the de-

mands of a rightful occupant. In the improbable case of conflicting demands at the same moment, a delivery of the keys to either would be lawful. Such is not the present case, nor is any such case likely to arise, if unauthorized persons are not sought to be introduced or kept in occupation. Such unauthorized use is the sole cause of the present difficulty, which could not have arisen, had the department entertained no demands except such as proceeded from the courts or the post office, and assumed no powers and responsibilities, except such as belonged to it.

As between the different courts all needful changes have hitherto been easily effected by voluntary readjustments. The papers upon this application show that the same accommodating spirit has been also extended to the post office, by surrendering to its use, for the time being, such room as for the present could be spared. It is not averred, nor do I think it true, that any rooms that could for the time being be spared by either, have been refused for the use of any lawful occupant. There is not, and never has been, any occasion for the exercise of any such arbitrary power as that claimed; and the avoidance of confusion and discord is to be attained by observing the provisions of the law, that the building is for the courts and the post office, and the uses incident thereto. Only discord, injury and confusion could result from the grant, or the assertion, of an arbitrary power of interference, such as is claimed in this instance.

3. Holding for the above reasons that the treasury department has no legal authority to interfere with the occupancy of rooms of this court, the propriety of the order to show cause, with the accompanying restraining order, seems to me so clear that little need be said in that regard. The decisions with reference to injunctions in actions are not applicable, since this is not an action.

The acts threatened would constitute, if committed, a contempt of court, as an unlawful interference with the rooms, books, papers and records in the possession of the court through its officer, the clerk; just as an interference with any other property in the custody of the court through its other officers, such as receivers or assignees, would constitute a contempt. In re Doolittle, 23 Fed. Rep. 544; U. S. v. Kane, Id. 748; In re Higgins, 27 Fed. Rep. 443; In re Steadman, 8 N. B. R. 319. The clerk is a necessary adjunct and part of the court. His possession is the possession of the court. Considering also that such papers and records are essential to the administration of justice and to the preservation of the rights of multitudes of persons, any unlawful interference with them, is "misbehavior in the presence of the court or so near thereto as to obstruct the administration of justice," within the provision of section 725, Rev. St. Per Mr. Justice Brown, in Re May, 1 Fed. Rep. 737, 742; People v. Barrett, 56 Hun, 351, 9 N. Y. Supp. 321.

The power to punish for contempt is inherent in every court, and has always been sustained as necessary for the maintenance of its authority, and to protect itself from attack and injury. Anderson v. Dunn, 6 Wheat. 204; Ex parte Burr, 2 Cranch, C. C. 379, 393; Ex parte Terry, 128 U. S. 289, 303, 307–309, 9 Sup. Ct. Rep.

77; In re Neagle, 39 Fed. Rep. 854–858. Contempts are not dealt with by action; but by summary proceedings. The practice to be adopted in reference to particular contempts, whether committed or threatened, is to some extent a matter of discretion with the court, provided due notice and opportunity to defend are afforded. The same grounds that justify punishment for a contempt after it is committed, must also be sufficient to restrain its commission, when its commission would be productive of permanent injury. Considering that the grounds for dealing with contempts at all are the maintenance and defense of the authority of the court, it would be most illogical to hold that while a party might be summarily punished for a contempt committed, the court could do nothing to prevent commission of the injurious act, not even by issuing its previous note of warning and restraint.

Restraining orders may be issued against the publication by newspapers of injurious comments pending the trial. Reg. v. Parnell, 14 Cox, Crim. Cas. 474; Coleman v. Railway Co., 8 Wkly. Rep. 734; Kitcat v. Sharp, 31 Wkly. Rep. 228. In the latter case Fry, J., says:

"I consider that I have jurisdiction to prevent contempt of court by injunction. If it were not so, see what would be the result. The court would be powerless to prevent an interference with justice, which it knows to be probable, and to secure the fair trial of the action. The very reason of the court's existence is to secure the fair and unprejudiced trial of actions. An example of the exercise by the court of the jurisdiction which I am now asked to exercise is to be found where, in the case of wards of court, persons not parties to the proceeding are restrained from committing what would be a contempt of court."

See, also, In re Neagle, 135 U. S. 1, 59, 10 Sup. Ct. Rep. 658. In some cases where the act would not be a contempt, a writ of inhibition may be issued, as on an appeal, in order to make the disobedience punishable as a contempt. Penhallow v. Doane, 3 Dall. 54, 87.

In a case like the present, where a disputed claim of right was involved, and it was the duty of the court to protect its possession and its records from assault, it was eminently proper that a notice and citation should be issued before the commission of the injurious act, in order that there might be previous judicial hearing and determination of the controverted question. No harm, but good alone, was thereby done to the respondents; while the interests of justice and of all concerned, made it specially proper that that mode of proceeding should be adopted. It was the duty of the clerk, on whom the safe-keeping of the papers and records of the court are imposed by law, and to the faithful performance of which he is sworn, as the appointee and officer of the court, to make known to the court the threatened unlawful interference and expulsion from one of its rooms. The issuing of a restraining order in reference to such a threatened contempt, is as "agreeable to the principles and usages of law," as the issuing of a writ of attachment after a contempt committed, and equally within the provision of section 716 of the Revised Statutes. Voss v. Luke, 1 Cranch, C. C. 333; U. S. v. Williams, 4 Cranch, C. C. 372.

In what has been said above, I have had no reference to those merely occasional and temporary uses of rooms, by persons or committees for special purposes, which, while not interfereing with the requirements of the courts, or of the post office, and assented to by them, may by courtesy be properly allowed, as a tenant or a custodian may entertain a guest.

For the reasons previously stated I think the order to show cause and the restraining order meantime, were properly granted. But as the hearing has furnished opportunity for full consideration of the legal questions involved, and for a deliberate adjudication by the court upon the merits, that the treasury department has no lawful authority to interfere with the court's possession of the room in question, it is probably unnecessary at the present time that any further order should be made in the matter; should any necessity therefor arise, it may be applied for.